## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:18-cv-03170-RM-STV</u>

**JANE DOE**;

      Plaintiff;

v.

**SCHOOL DISTRICT NUMBER 1, DENVER, COLORADO**, also known as Denver Public Schools ("DPS");

**TOM BOASBERG**, individually, and in his official capacity as superintendent of DPS;

**ANDY MENDELSBERG**, individually, and in his official capacity as a principal with DPS;

**JANN PETERSON**, individually, and in her official capacity as an assistant principal with DPS;

**JEANETTE SCULLEY**, individually, and in her official capacity as a dean with DPS;

**ERIC SINCLAIR**, individually, and in his official capacity as a dean with DPS;

**ANITA CURTISS**, individually, and in her official capacity as a school psychologist with DPS;

      Defendants.

---

### FIRST AMENDED COMPLAINT WITH JURY DEMAND

---

Plaintiff Jane Doe ("Ms. Doe") ("Plaintiff") hereby respectfully files this action against Defendants Denver Public Schools ("DPS"), Tom Boasberg ("Boasberg"), Anita Curtiss ("Curtiss"), Andy Mendelsberg ("Mendelsberg"), Jann Peterson ("Peterson"), Jeanette Sculley ("Sculley") and Eric Sinclair ("Sinclair") (collectively, "Defendants"), through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and state on information and belief as follows.

## I.    NATURE OF THE CASE

1.      This is a civil action seeking declaratory, injunctive, and other appropriate equitable relief to enjoin and restrain the deprivation, under color of state law, of Plaintiff's rights, privileges, and immunities as guaranteed by the Constitution and law of the United States, as more fully hereinafter appears.  This action seeks redress for violations of, and seeking redress under, federal law, including but not limited to the Equal Protection Clause of the Fourteenth Amendment to United States Constitution, 42 U.S.C. § 1983; 42 U.S.C. § 1988; 20 U.S.C. § 1681-1688 (the Title IX of the Education Amendments of 1972); 42 U.S.C. § 12101 (The Americans with Disabilities Act); 29 U.S.C. 701 and 794 (Section 504 of the Rehabilitation Act of 1973).  All discriminatory conduct alleged herein occurred in a public school setting.

## II.    JURISDICTION, PARTIES AND VENUE

2.      Jurisdiction is conferred upon this Honorable Court pursuant to 28 U.S.C. § 1331 and is founded upon the deprivation, under color of State law, of Plaintiff's rights, privileges, and immunities guaranteed by the Constitution of the United States, and, more particularly, under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983; 42 U.S.C. § 1988; 20 U.S.C. § 1681-1688 (Title IX of the Education Amendments of 1972); 42 U.S.C. § 12101 (The Americans with Disabilities Act); and 29 U.S.C. 701 and 794 (Section 504 of the Rehabilitation Act of 1973).

3.      Plaintiff is a resident of the City and County of Denver, Colorado ("Denver").

4.      Denver is a home-rule municipal corporation created by the Colorado Constitution and is located in Colorado.  Colo. Const. art. 20, § 1.  The Denver County School District No. 1, more commonly known as Denver Public Schools ("DPS"), is the public school system for Denver.  Colo. Const. art. 20, § 7.  DPS operates 207 schools, including traditional, magnet, charter, and

pathways schools with a total enrollment of about 92,000 students.  Hence, DPS is a resident of Denver, Colorado.

5.      The remaining individual defendants are residents of Colorado, and all of them were DPS employees at the time of the alleged wrongdoings.

6.      The wrongful acts alleged by the plaintiff occurred in whole or in part in Denver.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2).

### III.      FACTUAL ALLEGATIONS

8.      On July 1, 2015, Ms. Doe enrolled at East High School ("EHS" or "East"), a DPS school.

9.      On March 12, 2016, when Ms. Doe was fourteen years old, another EHS student, [STUDENT 1], sexually assaulted Ms. Doe.  The sexual assault took place in the basement of the home of [STUDENT 1]'s parents on a Saturday evening, when [STUDENT 1]'s father and brother were in the home.

10.      [STUDENT 1] forced himself upon Ms. Doe by orally copulating her after she specifically told him she did not want him to do that.  He also demanded that she orally copulate him.  She refused, and that this point, [STUDENT 1] became more aggressive and shoved her off the couch and onto the floor.  Ms. Doe bruised as a result.

11.      Ms. Doe and [STUDENT 1] were not dating at the time.  They were in one class together at EHS and were part of the same social circle.  On that evening, Ms. Doe visited [STUDENT 1]'s home only for the purpose of watching a movie with him.

12.      On the evening of March 12, 2016, Ms. Doe reported the sexual assault to her older sister and to a mutual friend of theirs.  Ms. Doe's older sister photographed the bruises to Ms. Doe's body inflicted by [STUDENT 1]

13.     On Monday, March 14, 2016, Ms. Doe was in her EHS art class and saw [STUDENT 1] there as well.  She became immensely distraught and began to cry.  Ms. Doe. removed herself to the restroom, where another girl saw her crying.  Ms. Doe explained to this girl, who was a friend of hers, why she was crying, and the girl suggested that Ms. Doe report what happened.  Ms. Doe went first to Ms. Jeanette Sculley ("Ms. Sculley"), a dean at East (deans are in charge of discipline at EHS), who then brought her to Ms. Anita Curtiss ("Ms. Curtiss"), a school psychologist at EHS.

14.     Ms. Sculley talked to Ms. Doe for several minutes about the assault – expressing her sadness, fear and confusion – and then Ms. Doe discussed it with Ms. Curtiss.  Ms. Doe told Ms. Curtiss about the rape and showed Ms. Curtiss her bruises.

15.     Ms. Curtiss asked Ms. Doe if she wanted to press charges, but Ms. Doe did not understand what this meant, and Ms. Curtiss did not explain it to her.  Ms. Doe and Mother made it very clear to Ms. Curtiss that she wanted the rape documented.  It was not documented in the DPS database, called Infinite Campus ("Infinite Campus").  Ms. Sculley also told Ms. Doe that if she talked to [STUDENT 1] again, then she would not be able to press charges, which is patently false information.

16.     Ms. Curtiss and Ms. Sculley then called Father to explain that Ms. Doe was claiming that she was sexually assaulted by a male peer.  Father was working in Vail, Colorado that day and called Mother.  While Father was driving from Vail to EHS, Mother drove immediately to EHS to meet with Ms. Doe and the administrators.  Ms. Doe was sent back to class, after which Ms. Doe's older sister met with Mother and the administrators.  During that meeting, Ms. Doe's older sister showed Ms. Sculley and Ms. Curtiss the photos of the bruises to Ms. Doe's body inflicted by [STUDENT 1]

17.     Father arrived at EHS and met with Ms. Sculley, Ms. Curtiss, Mother and Ms. Doe. Ms. Sculley and Ms. Curtis asked Ms. Doe's parents if they wanted to press charges.  Father and Mother responded that they did not want to ruin the boy's life, but made it very clear to Ms. Curtiss and Ms. Sculley that they wanted the rape documented in Ms. Doe and [STUDENT 1]'s files so there would be a record of the event and their concerns regarding [STUDENT 1]'s reoffending against Ms. Doe or another female student.  The sexual assault was not documented in Infinite Campus.

18.     Ms. Doe returned to class again and Ms. Sculley called in Ms. Doe's twin brother, who also was an EHS student at the time.  Ms. Sculley explained to Ms. Doe's brother that Ms. Doe was sexually assaulted but that he was not to retaliate against [STUDENT 1] because Ms. Doe's brother would then be the one who would be punished.

19.     Ms. Curtiss claims that, on March 14, she notified the parents that they had the right to make a police report.

20.     Every public or private school official employee in Colorado is what is known as a "mandatory reporter" under C.R.S. § 19-3-304(2)(l).  Under Colorado's mandatory reporter law, "any person specified in subsection (2) of this section who has reasonable cause to know or suspect that a child has been subjected to abuse or neglect or who has observed the child being subjected to circumstances or conditions that would reasonably result in abuse or neglect shall immediately upon receiving such information report or cause a report to be made of such fact to the county department, the local law enforcement agency, or through the child abuse reporting hotline system.."  C.R.S. § 19-3-304(1)(a).

21.     DPS provides on its website that, "ALL DPS employees are mandatory reporters of abuse or neglect under state law.  Mandatory reporters include all public or private school

officials or employees.  We are mandatory reporters even when we aren't on duty."  DPS, theCOMMONS, Mandatory Reporting, available at http://thecommons.dpsk12.org/Page/1932 (last viewed Oct. 2, 2018).  The DPS website even provides a Mandatory Report Form, easily available at the click of a mouse for all DPS employees.  *Id.*

22.	No contemporaneous mandatory report was made by any DPS employees of the sexual assault that occurred.

23.	Because Ms. Curtiss knew that a child had been sexually abused, even if she had informed Ms. Doe and her parents that they had a right to make a police report, she nevertheless violated her duty under the law by failing to make a police report herself.

24.	Ms. Sculley, also a mandatory reporter under state law, similarly violated her duty.

25.	Neither Ms. Curtiss nor Ms. Sculley contacted a school resource officer ("SRO"). SROs are designated Denver Police Department officers who are assigned to schools.  EHS had at least one onsite SRO designated to it at the relevant time.

26.	Ms. Doe's parents report that when they met with Ms. Sculley and Ms. Curtiss, the officials tried to talk them and Ms. Doe out of pressing charges, saying that the charges would be difficult to prove and doing so would be difficult on the family.

27.	On March 15, Ms. Doe reported to Ms. Sculley that she was facing backlash from peers, whom had heard about the assault.  Ms. Sculley told Ms. Doe that if Ms. Doe did not want people gossiping about it, then she should not tell anyone.  Ms. Sculley further told her that she should treat the rape as "our little secret between me, you and [[STUDENT 1]]."  She also told Ms. Doe that assaults like this happen a lot at EHS, and the faster Ms. Doe could move on and forget it then the better she will feel.  Ms. Sculley repeatedly discouraged Ms. Doe and the family from contacting the police and/or pressing charges.

28.      March 15 was the last time Ms. Doe met with Ms. Sculley, despite the fact that Ms. Doe would continue to endure ceaseless harassment during the remainder of the school year and the following school year, and that Ms. Sculley was a dean in charge of discipline at EHS.

29.      On March 17, Ms. Curtiss met with Ms. Doe.  The reason for the meeting was because Ms. Doe was "experiencing peer conflicts due to the situation from 3/14/16," according to Ms. Curtiss's notes.  This was a clear indication EHS received that Ms. Doe was experiencing retaliation at school based on her rape report.

30.      That same day, Ms. Curtiss reported that Ms. Doe regretted "talking with the school."  Ms. Curtiss also reported that she was "struggling with the fallout of her friendships this week."

31.      Also on that day, Mother informed Ms. Curtiss that Ms. Doe "is going to start seeing a therapist outside of the schools as well."

32.      By this time, as of March 17, 2016, despite having actual knowledge from Ms. Doe that she had been raped, EHS took absolutely no disciplinary action against [STUDENT 1]

33.      Under Colorado law, a student may be suspended or expelled for up to a year for any "behavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel, including behavior that creates a threat of physical harm to the child or to other children."  C.R.S. § 22-33-106(1)(c).

34.      It is not unusual – and in fact is quite common – for Colorado school districts to suspend and/or expel students for behavior that took place off school property, especially if there is a nexus to school property.  In this matter, Ms. Doe and [STUDENT 1] met at EHS, attended EHS together at the time of the rape, and continued to attend EHS together after the rape.

35.     On March 21, Ms. Curtiss met with Ms. Doe and "reviewed the limits of interaction with male peer." Ms. Curtiss claimed that Ms. Doe "agreed."

36.     During the entire week from March 14 through March 21, Ms. Doe expressed to Ms. Curtis repeatedly the growing tensions between Ms. Doe and fellow students, her anxiety about being at school, her fears for the future, and her nightmares and lack of sleep. Ms. Curtis repeatedly told her, "Well, some things are just more traumatizing for others," and she also instructed her "to find new friends already." Ms. Curtiss also told Ms. Doe that if she tried to discuss with [STUDENT 1] what had transpired, then she would be disciplined for "harassing him."

37.     At this point, instead of taking any action to discipline [STUDENT 1] or otherwise keep him away from Ms. Doe, EHS was warning Ms. Doe to stay away from [STUDENT 1]

38.     EHS was actively engaging in retaliation against Ms. Doe for her report of the rape by favoring [STUDENT 1] rather than accommodating Ms. Doe.

39.     There is no evidence that an EHS dean, SRO, assistant principal, or any other disciplinary figure took any action against [STUDENT 1]

40.     On or about March 23, Ms. Curtiss received information from one of Ms. Doe's friends that Ms. Doe had started to cut herself, which is something she had never done before. Ms. Curtiss told Ms. Doe she would have to fill out a safety plan form. Ms. Doe said she did not want to fill out that form unless her older sister, also an EHS student, was there. Ms. Curtiss refused to summon Ms. Doe's sister, and she also did not inform Ms. Doe's parents of the request to fill out a safety plan form. Ms. Curtiss also told Ms. Doe that she could not return to class until she completed the form. Ms. Curtiss promised Ms. Doe that she would have weekly check-ins to ensure her safety. There is no evidence that this happened, nor there is evidence that Ms. Curtiss ever contacted Ms. Doe's parents at this time to let them know that she was cutting herself.

41.     On April 6, Ms. Doe reported "ongoing conflict with peer group," according to Ms. Curtiss.  Rather than taking any disciplinary action against these peers or referring the matter to EHS disciplinary authorities, Ms. Curtiss instead "discussed strategies to manage conflict with female peers."

42.     On that same day, Ms. Carly Lacy ("Ms. Lacy"), one of Ms. Doe's teachers, emailed Ms. Curtiss and told her that Ms. Doe "has had a rough week with the gossip around her."

43.     On April 8, Ms. Curtiss wrote an email to Ms. Sculley to tell her that Ms. Doe was continuing to have problems with [STUDENT 1], and that [STUDENT 1]'s friends also were harassing her with various comments, including telling her, "We took a vote and we all agreed that you'll lose your virginity first."

44.     On that same day, Ms. Doe informed Ms. Curtiss, according to file notes by Ms. Curtiss, of "possible statements of self-harm."  Prior to the rape and subsequent inaction from EHS, Ms. Doe had never discussed self-harm.  By this point, however, Ms. Doe was engaging in serious self-harm – she was cutting herself.

45.     Also on that day, Ms. Curtiss wrote to Ms. Sculley, "Could you meet with [[STUDENT 1]] to reiterate that this issue is between [Ms. Doe] and himself.  That his friends defending him cannot be to (sic) verbally harass [Ms. Doe].  Ms. Sculley emailed Ms. Curtiss to tell her that she "will talk" to [STUDENT 1] on Tuesday.  Despite being the dean and having tremendous disciplinary authority at EHS, Ms. Sculley showed no willingness to take any action against [STUDENT 1] or his friends that would go beyond talking to him.

46.     On April 13, Ms. Curtis wrote Ms. Sculley and told Ms. Sculley that she and Ms. Doe "reviewed the expectations moving forward (no conversations, accusations, or explanations) and that actions her friends take on her behalf can reflect on [Ms. Doe]."  Ms. Curtiss indicated

that Ms. Doe's last question was, "If I have an opportunity to talk to him [[STUDENT 1]], I shouldn't?"  Then Ms. Curtiss wrote to Ms. Sculley, "so I'm guessing things may continue as usual."  Ms. Sculley wrote back to her on that day, "Stop it!  NO!! :-)"  The :-) is what is known as an "emoji" or an "emoticon" that is meant to represent a smiley face like this: ☺.

47.  On April 14, 2016, Ms. Curtiss claimed to have completed a Suicide Risk Review ("SRR") on Ms. Doe.  There is no evidence that an SRR was actually completed on this date, as it should have been.  Additionally, Ms. Doe's parents did not receive any notice that an SRR had been completed.

48.  On April 18, Ms. Curtiss wrote in an email that, "[Ms. Doe] has been having a peer conflict which recently led her to make statements of self harm . . . .  She has a private therapist and reported that she just feels very unhappy right now."

49.  By no later than May 14, 2016, at least 60 days had passed since DPS first learned of the reported rape.  By that time, no Title IX investigation had been initiated, let alone completed.

50.  By early June of 2016, the 2015-16 school year ended.  By that time, no Title IX investigation had been initiated or completed by DPS; no disciplinary action had been taken against [STUDENT 1] for the initial rape or subsequent harassment; and no disciplinary action had been taken against [STUDENT 1], his friends, or anyone else for their continued harassment of Ms. Doe.

51.  On September 1, there were additional reports that Ms. Doe was being bullied as a result of the rape.

52.  On November 28 and 29, there were additional reports indicating that Ms. Doe had ongoing conflicts with other students.

53.     Also on November 29, there were reports indicating that Ms. Doe had stated she did not want to attend South High School, which is another DPS school.

54.     In December of 2016, Ms. Curtiss met with Ms. Doe, and Ms. Doe told her that things at EHS had only gotten worse for her, and that she was considering switching schools.  Ms. Curtiss told her that if she switched schools, then she would only be running away from her problems.

55.     On January 19, 2017, Ms. Doe and her older sister made an anonymous Safe2Tell report where they described the excessive bullying and blackmailing by a student named [STUDENT 3] who is a close friend of [STUDENT 1]

56.     Automatically, a copy of every Safe2Tell report goes to the principal of the school concerning the report.  The principal of EHS on January 19 was Mr. Andy Mendelsberg ("Mr. Mendelsberg").

57.     On January 20, Eric Sinclair ("Mr. Sinclair"), a dean in charge of discipline, took Ms. Doe to his office, where Ms. Jann Peterson ("Ms. Peterson"), an EHS assistant principal, was waiting for her.  Mr. Sinclair asked Ms. Doe if she knew why she was in Mr. Sinclair's office, and Ms. Doe started crying immediately and told him about the Safe2Tell report.  Ms. Doe, in Ms. Peterson's presence, told Mr. Sinclair about the constant bullying and harassment she was experiencing from boys in the sophomore class at EHS.  She especially pointed to [STUDENT 2], who is [redacted].  [STUDENT 2] would constantly stare at Ms. Doe, smirk at her, associate with a group of other students who would make drawings of Ms. Doe telling her to kill herself, call her names, start rumors about her and make rape jokes about [STUDENT 1] to Ms. Doe.  Mr. Sinclair and Ms. Peterson said they were confused by Ms. Doe's story, so they asked her to tell it all from the beginning, going back to the sexual assault.  She proceeded to do so, and she identified – to

Mr. Sinclair and Ms. Peterson – [STUDENT 1] as the perpetrator of the rape.  Ms. Doe also stated which administrators she had previously worked with.  Neither Mr. Sinclair nor Ms. Peterson contacted Ms. Scully or Ms. Curtiss that day to see if a sexual assault report had been made.

58.      Neither of them made a police report at this time, nor did Mr. Mendelsberg.  This is, again, despite the fact that they were all mandatory reporters.

59.      Furthermore, Ms. Doe said that [STUDENT 3] shoved her down while at lunch at Noodles and Company, and then called her a "dirty slut."  She also said another boy, known as [STUDENT 4], made constant rape jokes to her.  Ms. Doe stated that several boys – including [STUDENT 3], [STUDENT 4], [STUDENT 2], [STUDENT 5] and [STUDENT 6]– pulled on her backpack all the time and would draw pictures of her killing herself.  She told them that [STUDENT 3] contacted her via Facetime over the summer of 2016 and asked Ms. Doe if she wanted to sexually experiment with him.  She told him she did not.

60.      On this day, Mr. Sinclair and Ms. Peterson contacted Ms. Doe's parents and brought them into the meeting.  Ms. Doe and her parents were expressing concerns about Ms. Doe's being bullied.  During this meeting, Mr. Mendelsberg came into the meeting to ask if Ms. Doe was okay but then abruptly left.  Mr. Sinclair explained to parents that he was in charge of discipline and assured Ms. Doe's parents that Ms. Doe would be safe under his care.

61.      Ms. Doe eventually was sent back to class to take a quiz, but then returned to Mr. Sinclair's office, where she started crying again.  She indicated to him that she was scared for what all of the identified boys would do to her if they found out she was the one who made the Safe2Tell report, and she expressed that she was afraid of getting in trouble.  Mr. Sinclair said that all of the boys would be held accountable, that she would be safe at EHS both emotionally and physically,

and that she would not get into trouble.  Mr. Sinclair took no disciplinary action against any of the students bullying Ms. Doe, and the bullying continued.

62.        On January 23, Mr. Sinclair and Ms. Curtiss discussed the bullying issue.

63.        On January 25, Ms. Elisa Spratt ("Ms. Spratt"), an EHS school psychologist, met with Ms. Doe to discuss safety concerns Ms. Doe had.  Ms. Spratt was brought in at the request of Mr. Sinclair.  At this meeting, Mr. Sinclair continued to maintain that he had no "hard evidence" of bullying.  Ms. Doe provided Mr. Sinclair with copies of numerous pictures and social media exchanges.  Ms. Doe also wrote down the names of all of the other students who were harassing her, in addition to their phone numbers.  Mr. Sinclair briefly glanced at what Ms. Doe provided and then placed everything into a filing cabinet.  There is no evidence that any of the information in the cabinet was used for investigatory or disciplinary purposes.

64.        On January 25, 2017, an SRR actually was completed on Ms. Doe.  The SRR shows that Ms. Doe's parents were contacted, but for some reason, they were not asked to come in to discuss her needs.  Additionally, DPS officials failed to contact Ms. Doe's therapist despite the fact that they were aware that she was working with one.  The SRR documented the reported rape by Ms. Doe, and it falsely claimed that the rape was reported to the Denver Police Department.

65.        It also documented that Ms. Doe felt "everyone got mad at her" for reporting [STUDENT 1]; that she wasn't sleeping well and thought about overdosing on sleeping pills; that she wrote a goodbye letter to her older sister; and that she was having nightmares thinking about [STUDENT 1] in her room.  The report also indicated that Ms. Doe lost interest in self-preservation.

66.        Significantly, the SSR indicated that Ms. Doe could have been suffering from an emotional disability.  Despite this, the Defendants took no steps to evaluate her for a 504 plan.

67.     The SSR made it clear that Ms. Doe felt that "things could get better if the boys are punished."  She was referring to [STUDENT 1] and the boys who were bullying her.  She stated that this "wouldn't fix all the friend problems but people wouldn't think she's lying."

68.     The SRR noted that there would be the following supports conducted by EHS: "Psychologist, Social Worker, Nurse or Counselor."  Supports going forward would turn out to be ineffective, inadequate, or nonexistent.

69.     On January 26, Ms. Lindsay Vesceri ("Ms. Vesceri"), a counselor at EHS, discussed concerns with Ms. Doe and her father, and those concerns were passed on to Mr. Sinclair.

70.     On January 31, Ms. Vesceri passed on additional concerns to Mr. Sinclair regarding harassment against Ms. Doe.  According to an email, Mr. Sinclair stated that he would "speak with the students."

71.     From late January to early February 2017, Ms. Doe met with Mr. Sinclair several times to report the bullying and harassment, including threats that she should watch her back if she does not "want to die."  She was told that she would be "beat up."  As a result, she started leaving through the back door because she was scared of them.  She also told Mr. Sinclair that [STUDENT 3] was intimidating a friend of Ms. Doe's by telling her not to have lunch again with Ms. Doe and that it would be "bad for her" if she did.  Sinclair met with Ms. Doe and her parents, who were expressing frustration to him that nothing was being done to address the bullying and harassment, but Mr. Sinclair said he could not do anything about it and that "being an asshole isn't a crime."

72.     During this time period, Ms. Doe would eat lunch mostly by herself in the counselors' offices or in various teachers' rooms.  It was at this time that she would form a close relationship with Ms. Lindsay Vesceri ("Ms. Vesceri"), a school counselor.

73.        On April 7, 2017, Ms. Sarah Rasay ("Ms. Rasay"), a teacher at EHS, emailed her concerns regarding Ms. Doe to Mr. Sinclair.  Ms. Rasay said that Ms. Doe received a Snapchat saying, "Consent is a myth."  This upset Ms. Doe.  Ms. Rasay reported at this time that "a group of students" had "harassed her since an incident last year."  Ms. Doe said that the main boy or his friends sent that Snapchat, which is a social media app that allows groups of people to share texts that are then automatically deleted.  Ms. Rasay also said someone from the group threatened to "beat her up."  Ms. Doe expressed feeling intimidated and said she doesn't go outside to lunch to avoid these students.  Ms. Doe said she was comfortable having Ms. Rasay tell the deans and counselor about this conversation.  Ms. Rasay wrote, "I am concerned that she does not feel safe at school and she doesn't feel protected."  Ms. Doe had not disclosed the sexual assault to Ms. Rasay.  There is no evidence that Mr. Sinclair ever responded to Ms. Rasay.

74.        On April 18, Ms. Doe was the recipient of a very harsh and embarrassing Instagram post.  Ms. Doe had a full breakdown later that day, throwing things in her room, punching the wall, hitting her head against the wall and screaming.  Father came in and calmed her down.  She did not go to school the next day.

75.        On April 23 or 24, Ms. Doe went to see the EHS athletic trainer, Ms. Lisa Smith ("Ms. Smith"), for an evaluation.  Ms. Smith diagnosed a concussion and asked Ms. Doe how she thought she got it.  Ms. Doe told her how it happened, but she did not disclose the rape to Ms. Smith, who then called Father.

76.        On April 28, Ms. Rasay forwarded her April 7 email to Mr. Joe Glover ("Mr. Glover"), an EHS assistant principal.

77.        On that same day, Ms. Doe told Ms. Rasay about her struggles with bullying and harassment, and then both of them went to meet with Ms. Vesceri.  Both Ms. Rasay and Ms.

Vesceri were upset that Mr. Sinclair was not taking proper action to stop the harassment, so all three of them brought in Mr. Vince Valdez ("Mr. Valdez"), another dean at EHS.  A meeting took place among the four of them, and Ms. Doe's mother was called to join.  There was a lengthy discussion about the bullying, and a safety plan to address Ms. Doe's suicide risk was signed.

78.       At no point was a safety plan developed in order to prevent [STUDENT 1] or any of the other boys from harassing Ms. Doe.

79.       On that April 28 date, Mother had a meeting with Mr. Valdez, Ms. Visceri, Ms. Doe, and Ms. Doe's older sister.  Mother received a copy of some of Ms. Doe's records, and at this point she was appalled to have learned that *absolutely nothing* was documented in her official records about the sexual assault, bullying and retaliation that had taken place against Ms. Doe. That day, Mother informed Ms. Vesceri that Ms. Doe would not be returning to EHS.

80.       On April 29, Ms. Doe went to the emergency room due to a panic attack.

81.       Shortly after this incident, in early May, Mother would go on to tell EHS officials that Ms. Doe would not be returning to EHS.  Mother asked, "How do we close her out?"  Ms. Visceri said that it would not be a problem, and that some teachers most likely would just freeze Ms. Doe's grades for that date and award her full credit because she was such a good student.  Ms. Doe's parents also asked Ms. Visceri why Ms. Doe's file was bereft of information related to her assault and bullying.  Ms. Visceri told them that she and other faculty members were instructed by EHS officials not to be detailed in file reports in case one of them ever has to appear in court.

82.       On May 1, Ms. Visceri informed Father that Mr. Mendelsberg was opposed to Ms. Doe's leaving and would not allow her to get full credit for her grades.

83.       On May 2, Ms. Doe's parents and Ms. Visceri had another meeting.

84.     On May 3, Mother was picking up Ms. Doe's records.   Ms. Visceri told Mother, "Andy (Mr. Mendelsberg) is on the stairs if you want to talk to him."  Mother declined, saying that she instead wanted a meeting with Mr. Mendelsberg.

85.     On May 4, Ms. Doe let Ms. Rasay know that she would not be returning to EHS for the rest of the school year.

86.     On or about May 4, Father and Mother met with Mr. Mendelsberg for two hours and told him that Ms. Doe had been raped by another EHS student, that Ms. Doe was the victim of constant bullying and harassment following the rape, and that EHS failed to protect Ms. Doe. As a result, they informed Mr. Mendelsberg that they were pulling Ms. Doe from EHS.   Mr. Mendelsberg was opposed to Ms. Doe's withdrawal, saying of the sexual assault and the subsequent harassment that Ms. Doe endured, "If it was that bad, she wouldn't have been able to maintain those grades."  Mother said that Ms. Doe dealt with the situation by sheltering herself in her classroom.

87.     During this meeting, Mr. Mendelsberg incredulously informed Ms. Doe's parents that he did not know initially who Ms. Doe was, and that he had to find out from [STUDENT 2], [REDACTED] one of the harassers, who she was.  Mr. Mendelsberg did not reach out to any of Ms. Doe's teachers or coaches about Ms. Doe.  He claims that this situation with Ms. Doe was news to him, as he had not heard about anything from any teacher or dean related to Ms. Doe.  He told the parents that he knew the boys who were bullying Ms. Doe and said they are friends of [STUDENT 2] and are good kids who sometimes make dumb decisions.  His advice to the parents was to get Ms. Doe to find new kids to befriend at school who are nicer, and that will smooth everything over.  Parents explain that is not a viable option and ask how Mr. Mendelsberg can ensure Ms. Doe's safety and well-being.  He stated that if Ms. Doe "remained an East Angel," he

could work with her but because her parents did not feel it was in her best interests to remain at EHS, there was little he could do.  Mr. Mendelsberg had never taken any meaningful action to help her.

88.      Eventually during the meeting, Mr. Mendelsberg relented and allowed Ms. Doe to finish out the school year at home on the condition that she completes every assignment and takes every test as if she were attending classes.  He went on to warn parents that Ms. Doe may be able to maintain some "A" grades but the best she can hope for is a "C" in Chemistry Honors and Algebra 2 Honors.

89.      An arrangement was made by Mr. Mendelsberg, which Ms. Doe and her parents were adamantly opposed to but under which they felt they had no other choice, that called for Ms. Doe to come in before school and after school to get her work done.  At least three times a week between May of 2017 and the end of the school year, which was a period that lasted roughly six weeks, Ms. Doe would come in sometimes as early as 5:30 AM until the beginning of school, or sometimes she would come in at 5 PM and leave at 7 PM in order to finish all of her schoolwork and maintain her high grades.  To the best of Ms. Doe's knowledge, no other student at EHS was subject to this kind of an arrangement.  While this arrangement was going on, Ms. Doe did not want to be in the EHS building at all, did not feel safe there and would still on occasion run into her harassers, including [STUDENT 1], who perpetrated the original sexual assault.  EHS made no accommodations provide work to Ms. Doe in a manner that would not require to be in the EHS building.  Ms. Doe also was required to take her final exams during the designated final exam times and in the same rooms as her harassers were in, thereby further revictimizing her.  Ms. Doe was only allowed to take one or two of her final exams in the deans' office.

90.     It should be noted that, during the aforementioned May 4 meeting, Mother specifically asked Mr. Mendelsberg if he had the authority on that day to close out Ms. Doe's grades and freeze them where they were as of that date, and he specifically told her that he did have such authority, but he refused to exercise it.

91.     Despite all of the unnecessary challenges that Mr. Mendelsberg presented, Ms. Doe completed the final weeks of school at home, took exams at EHS and achieved a 4.0 GPA.

92.     The 2016-17 school year ended in early June.  By that time, no Title IX investigation had been initiated or completed by DPS; no disciplinary action had been taken against [STUDENT 1] for the initial rape or subsequent harassment; and no disciplinary action had been taken against [STUDENT 1], his friends, or anyone else for their continued harassment of Ms. Doe.

93.     On August 28, 2017, following news breaking of a well-publicized cheerleading injury incident, the student of an EHS parent named Mary Smith ("Mary Smith") informed Mr. Boasberg via email: "I don't know that there's a pattern but I do know there are a lot of parents that think it is.  I'd encourage you or someone from Davis Graham to reach out to [Mrs. Doe], mother of 4, including a recent East grad headed to Tulane and ask her about why she has moved the other 3 to schools other than east (2 are now at South and 1 at St. Mary's).  I don't know the details exactly but they are related to Andy(Mr. Mendelsberg)'s handling of a bullying/violence situation impacting her daughter last year.  Her number is xxx xxx xxxx."

94.     There is no evidence that Mr. Boasberg or any other DPS official took any action immediately after receiving this information.

95.     Also on August 28, DPS General Counsel Jerome DeHerrera ("Mr. DeHerrera"), and left him a voicemail regarding the problematic culture at EHS with respect to responding to

claims of sexual assault and bullying.  Father then was contacted by a DPS liaison, who then put him in touch with Ms. Dana Risch ("Risch"), who was the DPS human resources investigatory handling issues at EHS.

96.     On September 26, Ms. Doe's parents sent a timeline of events to Ms. Risch, who later informed Father that she would circulate the timeline to the DPS general counsel's office.

97.     By October 25, Father still had not received a response, so he sent the timeline directly via email to Mr. Boasberg, Ms. Risch and Mr. Jerome DeHerrera ("Mr. DeHerrera"), DPS general counsel.

98.     On November 1, Ms. Amber Elias ("Ms. Elias"), an attorney with DPS, was finally and formally assigned to the matter by DPS – more than two months after Mr. DeHerrera had initially been contacted.

99.     On the week of November 6, Ms. Elias and Father spoke to discuss Ms. Doe's situation at EHS, and Father took contemporaneous notes.   During the thirty-minute phone conversation, Ms. Elias stated, among other things, the following:

    a.   there was a systemic failure at EHS and likely at DPS;

    b.   there were likely Title IX violations;

    c.   multiple parents had come forward regarding the cultural problem created by Mr. Mendelsberg and the EHS administration;

    d.   Ms. Elias had shared the timeline with new EHS principal Mr. John Youngquist ("Youngquist");

    e.   Mr. Youngquist would reach out to Ms. Doe's parents to discuss the failed process at EHS and how to fix the problem for future families at EHS (Youngquist never did this);

f.   there will be systematic changes to the administration at EHS following a comprehensive HR investigation by DPS;

g.   Ms. Elias personally put in place mandatory school reporting class for all DPS employees and the focus is on "victims first;"

h.   Ms. Elias stated that she was certain that when she reviewed EHS files on Ms. Doe and [STUDENT 1], she would discover that the sexual assault had been reported to police but that EHS had communicated poorly to the parents (the sexual assault was not reported to the police at the time); and

i.   Ms. Elias explained that she had reported the sexual assault to the Denver police the previous Friday.  However, Ms. Doe's Parents later learned that Ms. Elias actually instructed Youngquist to report the sexual assault to Denver police.

100.    On November 13, EHS SFO Tevonnon Jones called Father and explained to him how to proceed with a police report on behalf of Ms. Doe.

101.    On November 14, Mother took Ms. Doe to formally file a police report with the Denver Police Department.  They met with the detective, who informed them that two crimes had been committed – a sexual assault by [STUDENT 1] and a failure to report by numerous DPS school officials.

102.    On December 5, Ms. Cari Jimenez ("Officer Jimenez"), a detective in the Major Crimes Unit of the Denver Police Department Special Victims Unit who was assigned to Ms. Doe's case on November 16, contacted Ms. Jann Peterson ("Ms. Peterson"), an assistant principal at EHS, about the rape of Ms. Doe.  Ms. Peterson represented to Ms. Jimenez that she had never spoken to Ms. Doe's family about the rape.  This was a lie.  Ms. Peterson met with Ms. Doe, her

parents and Mr. Sinclair in Mr. Sinclair's office on January 20, 2017, and at that point Ms. Doe told her about the rape.

103.     On December 15, Ms. Peterson reported to Officer Jimenez that there were no behavioral records for [STUDENT 1] in the DPS database system known as Infinite Campus.  This means that, as of December 15, 2017, there were no computer records showing that [STUDENT 1] had been accused of rape.

104.     In 2018, [STUDENT 1] pleaded guilty to a felony sexual assault with force because of his actions against Ms. Doe.

## IV.     LEGAL OVERVIEW

105.     Section 1 of the Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

106.     Consistent therewith, on June 23, 1972 the President signed the Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").  Pub. L. 92-318, Title IX, § 901.  In pertinent part, Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  Title IX expressly contemplates within its nondiscrimination mandate "any public or private preschool, elementary, or secondary school . . . ."  *Id.* at (c).

107.     A state is not immune under the Eleventh Amendment to the United States Constitution from suit in Federal court for a violation of Title IX.  42 U.S.C. § 2000d-7.

108.     Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract, is authorized to effectuate Title IX by way of rules, regulations, or orders.  20 U.S.C. § 1682.

109.    The Office for Civil Rights, United States Department of Education regulations adopted pursuant to sections 1681 and 1682 at issue in this action are embodied in Chapter I of Subtitle B of Title 34 of the Code of Federal Regulations.  Specifically, 34 C.F.R. § 106.31(b) prohibits recipients of Federal funds from:

    (1)    Treat[ing] one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

    (2)    Provid[ing] different aid, benefits, or services or provide aid, benefits, or services in a different manner;

    (3)    Deny[ing] any person any such aid, benefit, or service;

    (4)    Subject[ing] any person to separate or different rules of behavior, sanctions, or other treatment;

    (5)    Apply[ing] any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

    (6)    Aid[ing] or perpetuat[ing] discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

    (7)    Otherwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity.

110.    Each recipient of Federal funds must designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX.  34 C.F.R. § 106.8(a). This obligation includes any investigation of any complaint communicated to such recipient alleging its noncompliance with Title IX.  *Id.*  Each recipient must notify all its students of the name, office address, and telephone number of the responsible employee.  *Id.*  Further, recipients must adopt and publish grievance procedures providing for prompt and equitable resolution of student complaints alleging any action prohibited by Title IX.  *Id.* at (b).

111.    Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks a school to take action, where a school knows or reasonably should know of an incident of sexual misconduct it must take steps to understand what occurred and to respond appropriately.  U.S. Dept. of Educ., O.C.R., Revised Sexual Harassment Guidance: Harassment of

Students by School Employees, Other Students, or Third Parties, p. 12 (Jan. 2001) (herein "2001 Guidance"), *available at https://tinyurl.com/yaeajxkz*.  In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, then a hostile environment exists and the school must respond.  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a).

112.    Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for the prompt and equitable resolution of complaints of discrimination on the basis of sex. 2001 Guidance, p. 19.  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.  *Id.*

113.    Title IX regulations do not prescribe particular procedures which a school must put in place, but whatever nondiscrimination policy the school effects must provide effective means for preventing and responding to sexual harassment.  *Id.*  The OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for:

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;
- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;
- Designated and reasonably prompt timeframes for the major stages of the complaint process;
- Notice to the parties of the outcome of the complaint; and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

2001 Guidance, p. 20.

114.     In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty so as to protect academic freedom.  2001 Guidance, p. 22.

115.     Although there is no specified timeframe under which a school must complete an action, an investigation must be completed within a reasonably prompt timeframe designated by an institution's policy, conducted in a manner that is consistent with the institution's policies and transparent to the accuser and accused with timely notice of meetings and equal access to information to be used during informal and formal disciplinary meetings and hearings.  34 C.F.R. § 668.46(k)(3)(i); 2001 Guidance, ps. 19-21.

116.     An "equitable investigation" includes the following:

> In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed.  A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school.  Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

> An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.  Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.  Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable.  Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.

> Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual

misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview.  Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.  Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation.  The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence.  The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.

U.S. Dept. of Educ., O.C.R., Q&A on Campus Sexual Misconduct, p. 4 (Sept. 2017), *available at https://tinyurl.com/y99osa9m* (citations omitted).

117.    DPS "is committed to providing equal educational opportunities through programs offered in the District regardless of race, color, gender, sexual orientation, gender identity, transgender status, religion, national origin, immigration/citizenship status, ancestry, age, marital status, pregnancy status, veteran status, or disability (collectively, "Protected Classes")."  DPS Board of Ed. Policies, J – Students, Equal Educational Opportunities and Nondiscrimination, JB (adopted Mar. 18, 2006, *last revised* June 14, 2018).  DPS's policy and resolution process concerning alleged discrimination and harassment of a student are contained in Policy AC and related regulations.  *Id.*

118.    DPS's Nondiscrimination/Equal Opportunity policy provides:

The District recognizes that discrimination and harassment can interfere with academic performance, job performance, emotional and physical wellbeing, and access to District programs and activities. Thus, preventing and remedying discrimination and harassment are essential to the District's mission.

. . .

Harassment based on a person's Protected Class status is a form of discrimination prohibited by state and federal law. Preventing and remedying such harassment is essential to ensure a nondiscriminatory, safe environment in which students can learn, employees can work, and members of the public can access and receive the

benefits of District facilities and programs. All such harassment by District employees, students, and third parties, is strictly prohibited.

All District employees and students share the responsibility to ensure that harassment does not occur at any District school, on any District property, at any District or school-sanctioned curricular or non-curricular activity or event, or off school property when such conduct has a nexus to the school.

. . .

Concerns about discrimination and harassment are often only raised and remedied when members of the public, students, employees, and applicants for employment can report such practices without the fear of retaliation. Thus, the District prohibits retaliation against an individual for raising a good-faith concern about or participating in good faith in an investigation of discrimination or harassment. The District will investigate and respond to an allegation of retaliation in the same manner as an allegation of discrimination or harassment.

DPS Board of Ed. Policies, A – Foundations and Basic Commitments, Nondiscrimination/Equal Opportunity, AC (adopted Mar. 18, 2006, *last revised* June 14, 2018).

119.     According to the Procedures for the Investigation of Complaints of Discrimination or Harassment provides that sex-based harassment is harassment based on gender, whether severe, pervasive, or persistent conduct based on gender, or a single severe act—such as an act of physical violence—based on gender. DPS Board of Ed. Policies, Procedures for the Investigation of Complaints of Discrimination or Harassment, AC-R1 (adopted Oct. 23, 2014, *last revised* July 13, 2018). Any conduct of a sexual nature directed by a student toward an employee or by an employee toward a student is presumed to be unwelcome. Id.

120.     "Retaliation" occurs:

when the District intimidates, coerces, or discriminates against an individual because the individual raised a good-faith concern about or participated in good faith in an investigation of discrimination or harassment. The District will investigate and respond to an allegation of retaliation in the same manner as an allegation of discrimination or harassment. Employees shall cooperate with District investigations in good faith.

*Id.*

121.     The Investigation regulations further provide:

**Note (Mandatory Reporting):** Some conduct qualifying as discrimination or harassment—particularly conduct involving physical violence—may also qualify as abuse or neglect.   Before taking any action related to discrimination or harassment, an employee should determine whether observed or alleged conduct or events create reasonable cause to believe that abuse or neglect has occurred, triggering the employee's mandatory reporting obligation under Board Policy (JLF and JLF-R) and state law.  If at any point during the investigation reasonable cause arises, the employee possessing reasonable cause shall satisfy the employee's mandatory reporting obligation before continuing the investigation.

*Id.* (emphasis in original).

122.     Moreover, DPS regulations provide:

Additionally, every employee shares in the responsibility of preventing and responding to discrimination and harassment. Thus, if an employee:

A.     is notified about an allegation of discrimination or harassment or about conduct or events reasonably suggesting that discrimination or harassment has occurred, or

B.     personally observes such conduct or events,

then the employee will take appropriate steps in response to the notification or observation. Appropriate steps may include but are not limited to:

A.     encouraging the individual raising the allegation (the Complainant or the Reporting Party) to make a complaint with the Discrimination Prevention and Response Designee or the Discrimination Prevention and Response Coordinator;

B.     personally submitting the External Discrimination Complaint Form; or

C.     notifying a supervisor, school administrator, the Discrimination Prevention and Response Designee, or the District's Discrimination Prevention and Response Coordinator.

If the employee is the District Discrimination Prevention and Response Coordinator or Designee and a Complaint Form has not yet been filed, then the Coordinator or Designee shall either personally submit the Complaint Form or otherwise ensure that the Complaint Form is submitted, and initiate an investigation.

*Id.*

123.     DPS instituted the new policies and procedures described above in part by and through a resolution agreement in OCR case number 08-16-1385, concerning alleged Title IX

violations.  Consistent therewith, DPS affirmed it would "ensure that its policies and procedures provide the following:

a. Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

b. Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

c. Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

d. Designated and reasonably prompt timeframes for the major stages of the complaint process;

e. Notice to the parties of the outcome of the complaint; and

f. An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

Resolution Agreement Denver Public Districts, OCR Complaint # 08-16-1385.

124. Additionally, DPS affirmed to the OCR that it would provide training to all DPS personnel charged with implementing the revised policies and procedures, including all District Title IX Staff (i.e., Title IX Coordinator, Title IX Investigators or other staff charged with responding to or receiving Title IX Reports). *Id.* Furthermore, DPS agreed to train such persons in the following:

instruction on how to conduct and document adequate, reliable, and impartial Title IX investigations, including an emphasis on the complainant's right to pursue the District's process and the law enforcement process at the same time, as well as a reminder of the policy prohibiting retaliation and intimidation; how to interview and interact with complainants in a way that is trauma-informed, sensitive and respectful; a definition of consent for sexual conduct used by the District; and what to do to respond to additional incidents of alleged sexual harassment and retaliatory harassment that the District receives notice of during an investigation.

125. Therefore, at least in writing, DPS policies and procedures mimic those required under Title IX.

126. The OCR closed its case file after receiving the various certifications required under the Resolution Agreement on September 26, 2017.  In the OCR case-closure letter, the OCR noted

that it would actively monitor DPS's implementation of the agreement, with a reminder against retaliation against those who report maltreatment.

## V.     CLAIMS AND CAUSES OF ACTION

### A.     FIRST CLAIM FOR RELIEF: 20 U.S.C. § 1681(a) *et seq*. – Deliberate Indifference to Sexual Harassment in Violation of Title IX of the Education Amendments of 1972 – against DPS

127.     Plaintiff realleges all other paragraphs as if fully set forth herein.

128.     A plaintiff must allege four factors to state a claim of school district liability under Title IX.  She must allege that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive, and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (*citing Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638 (1999).

129.     Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), which may include nonpublic institutions, *id.* at (c), but it has been consistently been interpreted as not authorizing suit against school officials, teachers, and other wrongdoers. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

130.     Plaintiff, Ms. Doe, was a DPS student.  Father and Mother, as Ms. Doe's parents, sue as her next friend.  Ms. Doe, as a female, is a member of a suspect class that has been historically an object of invidious discrimination.

131.     DPS, and the individual defendants, at all times relevant to this Complaint acted under color of state law.  DPS is a subdivision of Denver, a municipality in Colorado.  Hence, all defendants are state actors as contemplated by law.

132.     Beginning in March of 2016, Defendants had actual knowledge of, and have been deliberately indifferent to, repeated reports of a sexual assault against Ms. Doe and the subsequent bullying and retaliation against her as more fully described above.

133.     As a direct and proximate result of DPS's deliberate indifference, Ms. Doe was subjected to repeated bullying, ridicule, retaliation, and harassment at EHS, as more fully described above.  The acts of bullying and retaliation were severe, pervasive, and objectively offensive.

134.     The bullying and retaliation resulted in Ms. Doe suffering further significant, severe, and ongoing emotional distress and mental anguish.

135.     DPS's failure to take any action whatsoever at the appropriate time to stop the severe and pervasive bullying, ridicule, retaliation, and harassment at EHS, despite their authority and obligation to do so, was clearly unreasonable in light of known circumstances.

136.     During all times relevant to the allegations herein, DPS had a pattern and practice of Title IX non-compliance.  Highlights include, by way of example only:

a. An EHS cheerleader "Torture" case, Michael Roberts, Why There Will Be a Lawsuit in the East High Cheerleaders Splits Torture Case, Westword (Oct. 16, 2017, 6:42 a.m.), https://tinyurl.com/y8fajeur;

b. Another pattern of sexual assault where EHS officials failed to undertake adequate protective measures regarding another victim in a substantially similar manner as what occurred in this case, Stan Bush, Mother Fights For Daughter's Safety At East High School, 4CBS Denver (Aug. 14, 2018, 11:52 p.m.), https://tinyurl.com/y9tb3s38; and

c. One current OCR Title IX complaints under investigation, OCR, Pending Cases Currently Under Investigation at Elementary-Secondary and Post-

Secondary Schools as of September 28, 2018 7:30am Search (last visited

October 4, 2018 at 11:20 a.m., sorted CO), https://tinyurl.com/yc99fwgu, and

several prior Title IX OCR complaints.

137.    Ms. Doe was subjected to gender-based discrimination that was so severe, pervasive, and objectively offensive that she was denied access to educational opportunities and benefits.  Plainly, DPS elected to harbor and shelter a male student who later pleaded guilty for the sexual assault by changing the educational placement the victim rather than wrongdoer.

138.    Ms. Doe continues to suffer from considerable anxiety and emotional distress regarding her experience, safety, and well-being.

139.    Ms. Doe's rights to attend classes, advance in, and graduate from her chosen educational institution have been violated.

140.    DPS by and through its agents and employees' differing treatment of similarly or equally situated students on the basis of sex is engaging in unlawful and invidious discrimination.

141.    Ms. Doe has suffered damages as a result of DPS's deliberate indifference to its Title IX obligations.

142.    DPS's rules, regulations, policies, and/or procedures have no reasonable relationship to its stated educational goals or policies, no practical application to the performance and education of students, and are not necessary to the orderly and efficient instruction process.

**B.      SECOND CLAIM FOR RELIEF: 20 U.S.C. § 1681(a) *et seq*. – Retaliation in Violation of Title IX of the Education Amendments of 1972 – against DPS**

143.    Plaintiff realleges all other paragraphs as if fully set forth herein.

144.     20 U.S.C. § 1681(a) provides that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

145.     Ms. Doe brought her concerns to Ms. Sculley and Ms. Curtiss. They refused to advise her that they had a responsibility to contact the police at that point, and they refused to take any action against the perpetrator of the sexual assault. DPS officials also would go on to threaten Ms. Doe that she would herself be disciplined if she made contact with [STUDENT 1], and they worked with an EHS school resource officer to use that officer as an instrument to threaten Ms. Doe with criminal charges for some pictures that she had sent.

146.     When Ms. Doe and her parents informed EHS officials that they were leaving because EHS could not provide a safe environment, instead of closing out Ms. Doe's grades, which were stellar at the time, or providing reasonable accommodations for Ms. Doe, Mr. Mendelsberg developed a very complicated and difficult scheme for Ms. Doe that made it needlessly difficult for her to finish the school year.

147.     This retaliation constitutes a *per se* intentional violation of Title IX under clearly established Supreme Court precedent.

148.     DPS is not entitled to immunity as it receives federal funding under Title IX, which is conditioned on a clear, unambiguous, and unequivocal waiver thereof. Such waiver does not exist.

149.     Because DPS's retaliation is an intentional violation of Title IX, Plaintiff is entitled to monetary damages.

150.     Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

C. **THIRD CLAIM FOR RELIEF: 42 U.S.C. § 1983 Claim against Boasberg, Curtiss, Mendelsberg, Peterson, Sculley, and Sinclair acting in their individual and official capacities**

151.    Plaintiff realleges all other paragraphs as if fully set forth herein.

152.    This Complaint alleges in part the deprivation of rights afforded under the Fourteenth Amendment to the United States Constitution, and Title IX, rights clearly established, as more fully described in *Murrell*, 186 F.3d at 1250-52 (discussing qualified immunity), rights about which DPS and its agents and employees are acutely aware.

153.    As noted above, DPS has a municipal custom, policy, or practice of sex-based discrimination.  It has not properly implemented Title IX, despite numerous prior violations.

154.    DPS has, at least on paper, a Title IX policy likely meeting Title IX muster.  That written policy is not followed; rather, violating Title IX is the informal custom amounting to a widespread practice that is so well-settled as to constitute a custom or usage with the force of law. Indeed, DPS's custom was widespread—evidenced by failures to conform its policies in practice to Title IX at its elementary through high schools and, more particularly, acutely at EHS.

155.    DPS is the policymaking body for the district.  DPS had actual knowledge of DPS's system-wide Title IX violations by and through their receipt of various OCR complaints concerning Title IX violations but failed to put in place processes and procedures to ensure compliance therewith in practice and failed to supervise DPS's compliance.

156.    Messrs. Boasberg and Mendelsberg implemented DPS's informal policy of Title IX violations in practice.  Mr. Boasberg was a final policymaker for DPS as it relates to implementing district-wide Title IX processes and procedures.  Mr. Mendelsberg was a final policymaker for DPS as it relates to implementing Title IX processes and procedures in practice at EHS.

157.     This *de facto* policy is evidenced in DPS policies, procedures and practices effected in the pattern and practice of sex-based discrimination described more fully above.

158.     DPS, Mr. Boasberg, Mr. Mendelsberg, and Ms. Peterson failed to adequately train or supervise employees, especially Ms. Sculley, Mr. Sinclair, and Ms. Curtiss as to State and official DPS policy requiring mandatory reporting of sex crimes and of their Title IX obligations. These defendants had actual knowledge of DPS written policy, State law, and Title IX obligations but deliberately failed to follow these policies and law, as was their informal custom.  Their failures caused Ms. Doe injury.

159.     DPS's policy was closely related to Ms. Doe's federally protected rights under Title IX.   In other words, DPS's policy was the moving force behind the injury to Ms. Doe's constitutionally protected rights under Title IX.

**D.      FOURTH CLAIM FOR RELIEF: 42 U.S.C. § 1983 – Sex Discrimination in Violation of the Equal Protection Clauses of the Fourteenth Amendment – against Boasberg, Curtiss, Mendelsberg, Peterson, Sculley, and Sinclair, acting in their individual and official capacities**

160.     Plaintiff realleges all other paragraphs as if fully set forth herein.

161.     42 U.S.C. § 1983 provides that: "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . . ."

162.     Plaintiff is a citizen of the United States and Defendants are persons for the purposes of 42 U.S.C. § 1983.

163.     At all relevant times Defendants were acting under the color of state law in their capacity as employees at a public school.

164.     As the alleged conduct occurred during school hours, Defendants' acts were conducted within the scope of their employment.

165.     The Equal Protection Clause requires states to treat an individual in the same manner as others in similar conditions and circumstances.

166.     Plaintiff has a clearly recognized protected interest in her right to an education free from sex-based discrimination.

167.     Defendants' inappropriate conduct was of such severity that it created a hostile classroom environment.

168.     The hostile environment created by Defendants caused Ms. Doe to withdraw from EHS and had other adverse effects on her academic performance, thereby depriving her of her protected interest in a right to an education free from sex-based discrimination and caused her other damages.

169.     Defendants are not entitled to qualified immunity for their alleged acts.

170.     As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her federally-protected individual rights and suffered other damages including severe emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

171.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

172.     Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

**E.    FIFTH CLAIM FOR RELIEF: 42 U.S.C § 1983 – Deliberate Indifference to Sex Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment – against Boasberg, Curtiss, Mendelsberg, Peterson, Sculley, and Sinclair acting in their individual and official capacities**

173.    Plaintiff realleges all other paragraphs as if fully set forth herein.

174.    42 U.S.C. § 1983 provides that every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress.

175.    Plaintiff is a citizen of the United States and Defendants are persons for purposes of 42 U.S.C. § 1983.

176.    At all relevant times, Defendants were acting under the color of state law in their capacity as employees at a public school, and they were operating within the scope of their employment.

177.    The Equal Protection Clause requires government officials to treat an individual in the same manner as others in similar conditions and circumstances.

178.    Plaintiff has a clearly recognized protected interest in her right to an education free from sex-based discrimination.

179.    Plaintiff informed Defendants of the ceaseless harassment and intimidation that she was experiencing, and Defendants failed to act appropriately to address it.

180.    On multiple occasions, Ms. Doe spoke to Defendants about the sex-based discrimination she was experiencing at EHS, and they failed to act effectively to protect her.

Rather than protect her, they instead protected the person who later admitted sexual misconduct by pleading guilty to the same.

181.     Defendants were the appropriate persons for Ms. Doe to approach with these concerns.

182.     Defendants' inaction led to conduct against Ms. Doe to continue to go unchecked for a prolonged period of time.  Defendants' inaction was part of a pattern of deliberate indifference.

183.     In addition to their failure to take appropriate school action to protect Ms. Doe after her sexual assault, Defendants failed to report the sexual assault against her to the police, as required by State law.

184.     This deliberate indifference and failure to report by Defendants allowed a hostile school environment to grow and flourish.

185.     The hostile environment, facilitated by Defendants' deliberate indifference to serious sexual misconduct, deprived Plaintiff of her recognized interest in her right to an education free from sex-based discrimination and caused her other damages.

186.     Defendants are not entitled to qualified immunity for their alleged acts and omissions.

187.     As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her Constitutional rights and suffered other damages including severe emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

188.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

189.     Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

**F.     SIXTH CLAIM FOR RELIEF: Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act – against DPS**

190.     Plaintiff realleges all other paragraphs as if fully set forth herein.

191.     Section 504 ("Section 504") of the Rehabilitation Act of 1973, 29 U.S.C. § 794; 34 C.F.R. pt. 104, protects students with disabilities in public schools.  Much of Section 504 has been incorporated into the Americans with Disabilities Act ("ADA").  42 U.S.C. § 12101.

192.     Under Section 504, an individual with a disability (also referred to as a student with a disability in the elementary and secondary education context) is defined as a person who: (1) has a physical or mental impairment that substantially limits a major life activity; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 29 U.S.C. § 705(9)(B), (20)(B).

193.     The Section 504 definition of physical and mental impairment also includes any mental or psychological disorder.  34 C.F.R. § 104.3(j)(2)(i).

194.     The list of major activities under Section 504 includes but is not limited to: caring for oneself, eating, sleeping, learning, concentrating, thinking, communicating, and working.  29. U.S.C. § 705(9)(b), (20)(B); 4 U.S.C. § 12102(2)(A).

195.     A student may have a disability and be eligible for Section 504 services even if his or her disability does not limit the major life activity of learning.  Therefore, rather than considering only how an impairment affects a student's ability to learn, school staff must also consider how the impairment affects *any* major life activity of the student and, if necessary, assess what is needed

to ensure that students have an equal opportunity to participate in the school's programs.  34 C.F.R. § 104.35.

196.     A student may have a disability and be eligible for Section 504 services, including modifications, even if the student earns good grades.  This is because the student's impairment may substantially limit a major life activity regardless of whether the student performs well academically, and the student may need special education or related aids and services because of this disability.  42 U.S.C. § 12102.

197.     The determination of substantial limitation must be made on a case-by- case basis with respect to each individual student.  34 C.F.R. § 104.35.

198.     Section 504 requires that, for elementary and secondary school students, a group of knowledgeable persons draw upon information from a variety of sources in making this determination.  34 C.F.R. § 104.35(c).

199.     A student could also meet the definition of an individual with a disability by being *regarded as* a person with a disability.  34 C.F.R. § 104.3(j)(2)(iv).

200.     A school district must evaluate a student if it has reason to believe the student has a disability and the student needs special education or related services as a result of that disability, even if the student only exhibits behavioral (and not academic) challenges.  34 C.F.R. § 104.33.

201.     A school district must, at no cost to parents, evaluate students who are suspected of having a disability, or more than one disability, in all related or all specific areas of educational need.  34 C.F.R. § 104.35.

202.     A school must evaluate a student if the school has reason to believe the student is in need of special education or related services because of a disability.  34 C.F.R. § 104.35(a).

203.     DPS and its officials had ample evidence that Ms. Doe was struggling with her mental health as a result of its failure to take any kind of action to protect her as more fully described above.

204.     Defendants, despite actual knowledge of Ms. Doe's mental suffering as more fully described above, breached their affirmative duty to evaluate Ms. Doe for a special education and/or a 504 plan.  Hence, DPS was deliberate indifference to Ms. Doe's needs.

205.     As a result of the breach of this duty, Ms. Doe's suffering compounded, forcing her to continually be re-victimized while at school.

206.     Ms. Doe's suffering caused her damages in an amount to be proven at trial.

### G.     SEVENTH CLAIM FOR RELIEF
### (DECLARATORY AND INJUNCTIVE RELIEF)

207.     Plaintiff realleges all other paragraphs as if fully set forth herein.

208.     This is a civil rights suit in part requesting declaratory relief and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 brought by Ms. Doe to enjoin the discriminatory conduct alleged above on behalf of herself and all other DPS students.

209.     The parties have an actual dispute regarding whether DPS and its agents and/or employees violated Ms. Doe's constitutionally protected right to an education free from sex-based discrimination as well as whether DPS is engaging in a widespread custom of Title IX noncompliance.

210.     WHEREFORE, Plaintiff Ms. Doe requests declaratory judgment enter in her favor and against the Defendants that: Defendants' rules, regulations, policies, and procedures are unconstitutional and void; and Defendants have under color of law and deprived her of her rights, privileges, and immunities as guaranteed by the Constitution and Laws of the United States.

211.       Plaintiff Ms. Doe further requests that the Court: (1) issue a temporary restraining order and a preliminary injunction pursuant to F.R.C.P. 65, ordering Defendants, their officers, agents, employees, successors, attorneys, and all those in active concert or participation with them to refrain immediately and pending the final hearing and determination of this action from discriminatory conduct; (2) issue a permanent injunction perpetually enjoining and restraining Defendants, their officers, agents, employees, successors, attorneys, and all those in active concert or participation with them, of the conduct complained; (3)  award to Ms. Doe costs and disbursements, as well as reasonable attorney's fees; and (4) award Ms. Doe such other and further relief as this Court may deem proper, including but not limited to requiring Defendants to effect proper training to prevent the recurrence of such conduct in their hiring, firing, training and educational policies and procedures.

212.       WHEREFORE, Plaintiff Ms. Doe requests that judgment enter in her favor and against the Defendants jointly and severally, in an amount to be determined by a judge or jury and that the Court also award the Plaintiff her legal fees and costs incurred in pursuing this action.

## VI.    DAMAGES

213.       The Defendants' discriminatory and retaliatory conduct alleged hereinabove has caused the Plaintiff the following damages:

   a.   Lost front pay, future wages, and benefits in amounts to be established at trial;

   b.   Emotional upset, stress, and anxiety in an amount to be established at trial;

   c.   Out-of-pocket expenses, litigation costs, and attorney fees in amounts to be established at trial.

214.     Defendant's violations of Title IX, the Equal Protection Clause, Section 504 and the ADA were willful, entitling the plaintiff to an award of punitive damages to the fullest extent permitted by law.

## VII.     REQUEST FOR RELIEF

Plaintiff requests that the court enter judgment in her favor and against Defendants as follows:

215.     Awarding the Plaintiff special damages for front lost wages, benefits, and out-of-pocket expenses in amounts to be established at trail;

216.     Awarding the Plaintiff general damages for emotional distress in an amount to be established at trial;

217.     Punitive damages, pursuant to 42 U.S.C. § 1981, 2000(e), in the maximum amount permitted by law;

218.     Awarding the Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action;

219.     Awarding the Plaintiff prejudgment interest; and

220.     Awarding the Plaintiff any additional and further relief that the court finds equitable, appropriate, or just.

---

**PLAINTIFF REQUESTS A JURY ON ALL ISSUES SO TRIABLE**

---

<u>s/ Igor Raykin</u>
Igor Raykin, Esq.
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 748-8888
E-mail: igor@coloradolawteam.com
Attorney for Plaintiff