IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 1:18-cv-03170-RM-STV

JANE DOE,

    Plaintiff,

v.

SCHOOL DISTRICT NO. 1, DENVER, COLORADO a/k/a Denver Public Schools ("DPS");
TOM BOASBERG, individually and in his official capacity as superintendent of DPS;
ANDY MENDELSBERG, individually and in his official capacity as a principal with DPS;
JANN PETERSON, individually and in her official capacity as an assistant principal with DPS;
JEANETTE SCULLY, individually and in her official capacity as a dean with DPS;
ERIC SINCLAIR, individually and in his official capacity as a dean with DPS; and
ANITA CURTISS, individually and in her official capacity as a school psychologist with DPS;

    Defendants.

---

## ORDER

---

This matter is before the Court on two motions to dismiss: one by Defendant Mendelsberg (ECF No. 40) and another by the remaining Defendants (ECF No. 36). The motions have been fully briefed. (ECF Nos. 38, 39, 41, 42.) The Court has reviewed the pleadings, case file, and applicable law. For the reasons stated below, the Court grants both motions.

I.     **LEGAL STANDARDS**

In evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014); *Mink v. Knox*,

613 F.3d 995, 1000 (10th Cir. 2010). The complaint must allege a "plausible" right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007); *see also id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Conclusory allegations are insufficient, *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009), and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (quotation omitted). To determine whether a claim is plausible, a court considers "the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard doesn't require a plaintiff to set forth a prima facie case for each element." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1247 (10th Cir. 2016) (quotation omitted). However, if the allegations "are so general that they encompass a wide swath of conduct, much of it innocent," the plaintiff has not "nudged [her] claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quotation omitted).

Qualified immunity shields individual defendants named in § 1983 actions unless their conduct was unreasonable in light of clearly established law. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004).

## II.     BACKGROUND

The factual allegations in the first amended complaint (ECF No. 32) are taken as true for present purposes.  Plaintiff attended East High School ("EHS"), which is part of Defendant School District No. 1 ("DPS").  (*Id.* at ¶ 8.)  Plaintiff was fourteen in March 2016, when Student 1, a classmate, sexually assaulted her in his home on a Saturday evening.  (*Id.* at ¶ 9.)  The assault produced bruises on Plaintiff, which her older sister photographed.  (*Id.* at ¶¶ 10, 12.)  The following Monday, Plaintiff reported the assault to Defendant Sculley, a dean at EHS.  (*Id.* at ¶ 13.)  Defendant Sculley referred Plaintiff to Defendant Curtiss, a school psychologist.  Plaintiff discussed the incident with Defendant Curtiss and presented her bruises.  (*Id.* at ¶ 14.)  Defendant Sculley asked Plaintiff if she wanted to press charges, but Plaintiff did not understand what that meant.  (*Id.* at ¶ 15.)

Later that day, Defendants Sculley and Curtiss met with Plaintiff's mother and Plaintiff's older sister, who showed them the photos of Plaintiff's bruises.  (*Id.* at ¶ 16.)  Defendants Sculley and Curtiss then met with Plaintiff's mother and father.  (*Id.* at ¶ 17.)  When asked whether they wanted to press charges, Plaintiff's parents responded that they did not want to ruin the boy's life but that they did want the assault documented in Plaintiff's and Student 1's files.  (*Id.*)  Although Defendants Sculley and Curtiss were mandatory reporters under Colorado law, *see* Colo. Rev. Stat. § 19-3-304(2)(*l*), they did not report the assault.

That same week, Plaintiff met with Defendant Sculley again to report that she was facing "backlash" from peers who had heard about the assault.  (*Id.* at ¶ 27.)  Plaintiff also met with Defendant Curtiss several times and stated that she regretted informing EHS about the assault because it had led to "peer conflicts" and she was "struggling with the fallout of her friendships."

(*Id.* at ¶¶ 29, 30, 36.)  Plaintiff was warned[1] to stay away from Student 1, and there is no allegation that he refused to stay away from her after she reported the assault.  (*Id.* at ¶ 37.)  Nor is there an allegation that she and Student 1 were in any classes together or that other circumstances within the school's control compelled her to have to interact with him on campus.

In the weeks that followed, Defendant Curtiss learned that Plaintiff "had started to cut herself, which is something she had never done before." (*Id.* at ¶ 40.)  In addition, Plaintiff told Defendant Curtiss that she was having ongoing conflict with her peers, that she was continuing to have problems with Student 1, and that his friends were harassing her.  (*Id.* at ¶¶ 41, 43.)  One of them told her, "We took a vote and we all agreed that you'll lose your virginity first." (*Id.* at ¶ 43.)  Defendant Curtiss had Plaintiff fill out a safety plan form and reminded her not to talk to Student 1.  (*Id.* at ¶¶ 40, 46.)  Defendant Curtiss also asked Defendant Sculley to talk with Student 1 and remind him that he and his friends were not to harass Plaintiff.  (*Id.* at 45.)

According to the complaint, the following fall "there were additional reports that [Plaintiff] was being bullied" and having "ongoing conflicts with other students." (*Id.* at ¶¶ 51, 52.)  In December 2016, Plaintiff told Defendant Curtiss that she was considering switching schools.  (*Id.* at ¶ 54.)

In January 2017, Plaintiff and her older sister made an anonymous Safe2Tell report[2] accusing Student 3, a close friend of Student 1, of "excessive bullying and blackmailing."

---

[1] The complaint attributes the warning to "EHS" but not any specific individual.
[2] "[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KIB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation omitted).  The Safe2Tell report states, in pertinent part: "Caller received information about sophomore [Student 3] that has nude photos of female students on a phone app.  The app is disguised []as a calculator.  [Student 3] has used the photos to blackmail these students." (ECF No. 40-1 at 1.)

4

(*Id.* at ¶ 55.) Although the report was sent to Defendant Mendelsberg, the principal of EHS, it was handled by Defendant Sinclair, a dean, and Defendant Peterson, an assistant principal. (*Id.* at ¶¶ 56, 57.) The day after the report was made, Defendants Sinclair and Peterson met with Plaintiff, who admitted that she made the report. (*Id.* at ¶ 57.) She complained about bullying and harassment by Student 2, stating that he "would constantly stare at [her], smirk at her, associate with a group of other students who would make drawings of [Plaintiff] telling her to kill herself, call her names, start rumors about her and make rape jokes about [Student 1] to [her]." (*Id.*) Plaintiff informed Defendants Sinclair and Peterson about the March 2016 assault by Student 1, but neither of them reported it to the police. (*Id.* at ¶¶ 57, 58.) Plaintiff also reported that Student 3 had "shoved her down while at lunch [off campus] and then called her a 'dirty slut.'" (*Id.* at ¶ 59.) In addition to Students 1, 2, and 3, Plaintiff identified three other male students who "pulled on her backpack all the time and would draw pictures of her killing herself." (*Id.*)

Defendants Sinclair and Peterson met with Plaintiff's parents that day. (*Id.* at ¶ 60.) According to the complaint, "During the meeting, [Defendant] Mendelsberg came into the meeting to ask if [Plaintiff] was okay but then abruptly left." (*Id.*) After Plaintiff was sent back to class, she returned to Defendant Sinclair's office because she was afraid of what the boys she identified would do to her if they found out she made the Safe2Tell report. (*Id.* at ¶ 61.)

The same month, a suicide risk review ("SRR") on Plaintiff was completed.[3] (*Id.* at ¶ 64.) DPS contacted Plaintiff's parents regarding the SRR but not her therapist. (*Id.*) The SRR stated that the March 2016 assault had been reported to the police, even though it had not been.

---

[3] Although the complaint does not attribute to report to any specific individual, it alleges elsewhere that Defendant Curtiss claimed to have completed an SRR on Plaintiff in April 2016. (ECF No. 32 at ¶ 47.)

(*Id.*)  The SRR also stated that Plaintiff had "lost interest in self-preservation"; "wasn't sleeping well and thought about overdosing on sleeping pills"; "wrote a goodbye letter to her older sister"; and "was having nightmares thinking about [Student 1] in her room."  (*Id.* at ¶ 65.)  The SRR further opined that Plaintiff might be "suffering from an emotional disability."  (*Id.* at ¶ 66.)

Plaintiff met with Defendant Sinclair several times in the weeks that followed.  (*Id.* at ¶¶ 62, 63, 71.)  A school psychologist was present at one of those meetings.  (*Id.* at ¶ 63.)  Plaintiff "wrote down the names of all of the other students who were harassing her" and provided "copies of numerous pictures and social media exchanges."  (*Id.*)  Plaintiff made multiple reports of "bullying and harassment," and her parents met with Defendant Sinclair to express their frustration "that nothing was being done to address [it]."  (*Id.* at ¶ 71.)

In April 2017, Plaintiff received social media postings that upset her, including a Snapchat message that said, "Consent is a myth."  (*Id.* at ¶¶ 73, 74.)  After yet another meeting with another dean, a counselor, and Plaintiff's older sister, Plaintiff's mother decided that Plaintiff "would not be returning to EHS."  (*Id.* at ¶ 79.)  Plaintiff's parents met with Defendant Mendelsberg the following month to discuss her withdrawal.  (*Id.* at ¶ 86.)  Six weeks remained of the school year, and Defendant Mendelsberg refused to "freeze" Plaintiff's high grades where they were.  (*Id.* at ¶ 90.)  Instead, Plaintiff's parents and Defendant Mendelsberg decided that for the remaining six weeks of the school year Plaintiff could stay home during normal school hours but would have to come in before or after school at least three days per week.  (*Id.* at ¶¶ 88, 89.)  She still "was required to take her final exams during the designated final exam times and in the same rooms as her harassers were in, thereby further revictimizing her."  (*Id.* at ¶ 89.)  Plaintiff complied with this arrangement and ended the school year with a 4.0 grade-point average.  (*Id.* at ¶ 90.)

6

In August 2017, Defendant Boasberg, the superintendent of DPS, received an email from "the student of an EHS parent" suggesting Plaintiff's mother withdrew Plaintiff from EHS because of Defendant Mendelsberg's handling of Plaintiff's situation. (*Id.* at ¶ 93.) In the following months, Plaintiff's parents communicated with an investigator and attorney with DPS to discuss Plaintiff's situation. (*Id.* at ¶¶ 95-99.)

In November 2017, Plaintiff filed a police report about the March 2016 assault, and "[i]n 2018, [Student 1] pleaded guilty to a felony sexual assault with force because of his actions against [Plaintiff]." (*Id.* at ¶ 104.)

Plaintiff filed this lawsuit in December 2018, asserting seven claims for relief. Six claims remain: Claims One and Two are for deliberate indifference to sexual harassment and retaliation in violation of Title IX against DPS; Claim Three has been dismissed by Plaintiff (*see* ECF No. 41 at 1); Claims Four and Five are for sex discrimination and deliberate indifference to sex discrimination in violation of the Equal Protection Clauses of the Fourteenth Amendment, brought under 42 U.S.C. § 1983 against the individual Defendants individually and in their official capacities; Claim Six is for violations of the Rehabilitation Act and Americans with Disabilities Act against DPS; and Claim Seven is for declaratory and injunctive relief.

Defendant Mendelsberg and the remaining Defendants have filed separate motions to dismiss that are now ripe.

### III. DISCUSSION

#### A. Title IX Sexual Harassment Claims

Title IX prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681(a), which encompasses sexual harassment, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646-47 (1999). A school district may be held liable for student-on-student sexual harassment under

7

Title IX if it (1) has actual knowledge of, and (2) is deliberately indifferent to (3) harassment that is so severe, pervasive, and objectively offensive that it (4) deprives the victim of access to the educational benefits or opportunities provided by the school. *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999). As a threshold matter, the Court finds that the complaint fails to allege harassment that was based on Plaintiff's sex. The Court further finds that Plaintiff's allegations do not satisfy the second and third elements required to state a claim.

    1.    <u>Sex-Based Harassment</u>

Although the Tenth Circuit Court of Appeals has not addressed the term "on the basis of sex" in the context of a Title IX claim, it has addressed similar language in Title VII, 42 U.S.C. § 2000e-2(a)(1), which prohibits employers from discrimination against any individual "because of such individual's . . . sex." *See Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1263 (10th Cir. 2005). "[T]he critical issue in determining whether harassment is because of sex is whether members of one sex are subjected to a disadvantage to which the other sex is not." *Id.*

The allegations in the complaint do not suggest that Plaintiff was treated unfavorably because she is female; rather, they suggest that other students harassed her because they learned she had accused Student 1 of sexually assaulting her. There is neither any allegation that DPS responded differently when a male student made a similar accusation against another student at EHS nor any indication that it would have done so. Plaintiff contends her case is similar to *Doe v. East Haven Board of Education*, 200 F. App'x 46 (2d. Cir. 2006) (unpublished). But that case is not binding on this Court. Moreover, because the decision "assume[d] the parties' familiarity with the underlying facts," *id.* at 47, it provides little useful guidance in analyzing Plaintiff's claims. Plaintiff cites no binding or persuasive authority for the proposition that the harassment she endured constitutes discrimination on the basis of sex.

8

### 2. Deliberate Indifference

A school district is deliberately indifferent to acts of student-on-student harassment only if its response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 (10th Cir. 2008). "The standard is not that schools must remedy peer harassment, but that they must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 1123 (quotation omitted). "[S]chools need not expel every student accused of sexual harassment to protect themselves from liability, and victims of peer harassment do not have a Title IX right to make particular remedial demands." *Id.* (quotation omitted). Courts are discouraged from second-guessing school disciplinary decisions. *Id.*

After Plaintiff reported the March 2016 sexual assault to DPS, she was referred to a school psychologist. A meeting with her parents was held the same day. At the meeting, Plaintiff's parents indicated that they did not want to press charges against Student 1. In light of that decision, it was not "clearly unreasonable" for Defendants Sculley and Curtiss not to make a police report. Plaintiff cites no authority for the proposition that the failure to comply with a mandatory reporting statute amounts to deliberate indifference under such circumstances. Courts from other jurisdictions that have considered whether the failure to comply with Title IX regulations or report an allegation to authorities amounts to deliberate indifference have concluded that it does not. *See, e.g., Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014); *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 388 (5th Cir. 2000); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291-92 (1998) ("[F]ailure to comply with the [Title IX] regulations . . . does not establish the requisite actual notice and deliberate indifference.").

9

Nor do the allegations show that DPS's response to Plaintiff's reports of harassment, including the January 2017 Safe2Tell report, was clearly unreasonable. Those reports prompted EHS deans and a school psychologist to meet with Plaintiff, and sometimes her parents and other family members, numerous times. The allegations do not support her conclusory assertion that "[t]here was no response at all." (ECF No. 41 at 4.) Plaintiff received advice on handling the "backlash" and "peer conflicts" she was facing (ECF No. 32 at ¶¶ 27, 29), and the students Plaintiff accused of harassment were referred to EHS deans on multiple occasions. She did not report any further contact by Student 1 after reporting the assault to DPS. Even if Plaintiff does not think that the advice was helpful or that the disciplinary measures were adequate, it cannot be said that DPS did nothing. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649 (1999) ("In an appropriate case, there is no reason why courts, on a motion to dismiss . . . could not identify a response as not 'clearly unreasonable' as a matter of law.").

DPS was not required to eliminate all peer harassment. *See id.* at 648. Although the harassment persisted after Plaintiff's complaints, the Supreme Court has instructed courts to "bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults," *id.* at 651. Just because DPS did not stop harassment from occurring, that does not mean that it acquiesced to such a degree that its response was clearly unreasonable. *See id.* at 649 ("[I]t would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims."). Plaintiff's allegations do not show that DPS's response to Plaintiff's complaints was clearly unreasonable under the known circumstances.

### 3. Severe, Pervasive, and Objectively Offensive Harassment

Although the words "harassment" and "bullying" are used repeatedly throughout the complaint, there are relatively few allegations of specific conduct by specific individuals. Conclusory statements that do not allow the Court to draw the reasonable inference that a defendant is liable for the misconduct alleged are insufficient to survive a motion to dismiss. For example, the complaint does not explain who made the comment that Plaintiff would lose her virginity first or what conduct underlies the allegation that Student 3 engaged in excessive bullying and blackmailing. The Court is not bound to accept conclusory allegations that are mere labels.

The complaint does allege a handful of specific instances of harassment. For example, there are allegations that Student 2 made "rape jokes" about Student 1 and that Student 3 shoved Plaintiff down and called her a "dirty slut."[4] But given the roughly fifteen-month time span covered by the relevant allegations, the Court is not persuaded that the few specific instances described in the complaint are adequate to show harassment that was pervasive and severe. *Cf. Davis*, 526 U.S. at 653 (finding pervasive and severe harassment where misconduct over a five-month period "included numerous acts of objectively offensive touching" and "there were multiple victims who were sufficiently disturbed by [the] misconduct to seek an audience with the school principal."); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (finding pervasive and severe harassment where victim was stabbed in the hand with a pen and on another occasion two male students held her as others yanked off her shirt and pulled her hair); *Murrell*, 186 F.3d at 1248 (finding pervasive and severe harassment where over the course

---

[4] With respect to Student 1, the complaint contains no allegation of specific conduct following the March 2016 assault, merely alleging that Plaintiff "was continuing to have problems with" Student 1 a month after the assault.

of a month the victim was repeatedly taken to a secluded area and battered, undressed, and sexually assaulted). The standard for evaluating whether a school's response to harassment is clearly unreasonable is not meant to transform every school disciplinary action into a jury question. *Vance*, 231 F.3d at 260. Plaintiff's allegations, though troubling, do not rise to the level of pervasive and severe harassment.

**B.     Title IX Retaliation Claims**

Although the Tenth Circuit Court of Appeals has not expressly set forth the elements for a retaliation claim under Title IX, other courts have applied the standards from Title VII cases. *See Tackett v. Univ. of Kan.*, 234 F. Supp. 3d 1100, 1108-09 (D. Kan. 2017). To state a claim, Plaintiff needed to allege that (1) she engaged in protected activity, (2) DPS knew of the protected activity, and (3) materially adverse school-related action was taken against her (4) that was causally related to the protected activity. *See id.* at 1109. For present purposes, the Court assumes the first two elements are satisfied. However, Plaintiff has failed to allege materially adverse action by DPS or a causal connection between its actions and her protected activity.

        1.     <u>Materially Adverse Action</u>

Plaintiff asserts the following actions by DPS were materially adverse to her: (1) "refus[ing] to advise her that they had a responsibility to contact the police" after she reported the March 2016 sexual assault, (2) "refus[ing] to take any action against" Student 1, (3) "threaten[ing Plaintiff] that she would herself be disciplined if she made contact with" Student 1, (4) "threaten[ing Plaintiff] with criminal charges for some pictures that she had sent, and (5) not "closing out" Plaintiff's grades or "providing reasonable accommodations" to address Plaintiff's situation. (ECF No. 32 at ¶¶ 145, 146.)

The Court finds no basis to infer that these actions were materially adverse to Plaintiff. First, DPS had no duty to inform Plaintiff about mandatory reporting rules, and in any event her parents expressly declined to press charges against Student 1. Second, the allegation that no action was taken against Student 1 is conclusory. Moreover, Plaintiff does not explain, given her parents' decision not to press charges, what action DPS should have taken against Student 1 based on her allegation that he sexually assaulted her off campus and not during school hours. *See Davis*, 526 U.S. at 644 ("[Title IX's] plain language confines the scope of prohibited conduct based on the [school district's] degree of control over the harasser and the environment."). Third, there is no allegation that DPS carried out its threat to discipline Plaintiff for contacting Student 1 on campus, and the circumstances suggest that she was warned against contacting him not as a form of punishment but for her own protection and to avoid escalating and perpetuating the peer conflicts in which she was involved. Fourth, there is no allegation that DPS carried out its threat to discipline Plaintiff for sending photos or that she could not have been culpable for any pictures she may have sent. Fifth, DPS had no duty to provide whatever accommodations she considered reasonable, including awarding Plaintiff her grades based on her standing six weeks before the end of the school year. "Title IX does not require a funding recipient to acquiesce in the particular remedial action a victim seeks. Nor does Title IX prescribe any particular mandatory remedial action." *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1099 (10th Cir. 2019). Thus, Plaintiff has not identified materially adverse action by DPS to support her retaliation claim.

2. Causal Connection

Most of the alleged adverse actions are in fact allegations that DPS failed to undertake actions that Plaintiff wanted it to undertake, but Plaintiff's allegations do not show that DPS

13

failed to act due to her protected activity. Nor has she alleged any facts suggesting that DPS would not have threated to discipline her for contacting Student 1 or sending pictures to other students had she not reported the March 2016 assault or the subsequent harassment and bullying she endured on and off campus. As a result, Plaintiff's allegations fail to provide a basis to infer that any of DPS's actions listed above were caused by her engaging in protected activity.

### C. Rehabilitation Act and Americans with Disabilities Act Claims

Plaintiff alleges that DPS violated the Rehabilitation Act and the ADA by failing to evaluate her "for a special education and/or a 504 plan." (ECF No. 32 at ¶ 204.) However, Plaintiff does not allege that she in fact needed these services. In the absence of such a need, there is no basis to infer that Plaintiff was prejudiced by the lack of an evaluation. Accordingly, DPS is entitled to dismissal of these claims.

### D. Section 1983 Claims

Plaintiff's § 1983 claims are based on the legal theory that the individual Defendants violated her rights under the Equal Protection Clause. Claims Four and Five both allege that Plaintiff was deprived of her "right to an education free from sex-based discrimination." (ECF No. 32 at ¶¶ 168, 185.) Claim Four alleges that because "Defendants' inappropriate conduct was of such severity that it created a hostile classroom environment," while Claim Five alleges that "deliberate indifference and failure to report by Defendants allowed a hostile school environment to grow and flourish." (*Id.* at ¶¶ 167, 184.) As explained below, the Court finds the claims against these Defendants in the individual capacities are barred by the doctrine of qualified immunity. The claims against them in their official capacities are treated as claims against DPS, the entity they all represent, *see Meyer v. Bd. of Cty. Comm'rs*, 482 F.3d 1232, 1237 (10th Cir.

2007), and fail because Plaintiff has failed to allege a DPS policy or custom or a decision by a final policymaker that violated her constitutional rights.

### 1. Individual-Capacity Claims

When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to show that the defendant's conduct violated the plaintiff's federal constitutional or statutory rights and that those rights were clearly established. *Estate of Booker*, 745 F.3d at 411. On a motion to dismiss, a defendant is entitled to qualified immunity if it appears beyond doubt that the plaintiff can prove no set of facts in support of her claims. *Peterson*, 371 F.3d at 1201. Plaintiff's attempts to meet her burden with respect to the qualified immunity defense fall well short of the mark.

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Here, the alleged constitutional violation supporting Plaintiff's claims is that she received unequal treatment because she is female. But there is no allegation that the individual Defendants treated a similarly situated male student differently than they treated Plaintiff. Accordingly, there is no basis to infer that Plaintiff's rights under the Equal Protection Clause were violated. Nor has she shown a clearly established right to specific remedial measures by the individual Defendants in response to her allegation of off campus sexual assault or her complaints of harassment. The individual Defendants are entitled to qualified immunity on these claims.

### 2. Official-Capacity Claims

The lack of a constitutional violation precludes Plaintiff's claims against the individual Defendants in their official capacities as well. Moreover, to state a claim against the individual

Defendants in their official capacities, Plaintiff needed to allege discriminatory actions that represented an official policy or custom of DPS or were taken by a final policymaker of DPS. Plaintiff concedes that "DPS has, at least on paper, a Title IX policy likely meeting Title IX muster" but argues that DPS has a widespread practice or custom of not following that policy at EHS. (ECF No. 32 at ¶ 154.) But even assuming the individual Defendants were final policymakers for DPS, official capacity claims require a showing that the governmental entity "is a moving force behind the deprivation." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quotation omitted). Plaintiff has not alleged any "inappropriate conduct" by the individual Defendants that caused, encouraged, or contributed to the alleged harassment. Instead, she argues that their efforts to address it were inadequate because they "allowed" it to occur. That does not make the individual Defendants a moving force behind the alleged harassment or its continuation. In short, where the individual Defendants acted in response to alleged harassment, but were unsuccessful in stopping its sporadic recurrence, Plaintiff would have the Court conclude that "policy" was the culprit. Such a conclusion is not supported by the non-conclusory allegations in this case. For these reasons, the Court dismisses the claims against the individual Defendants in their official capacities.

### E. Claims for Declaratory and Injunctive Relief

Finally, Defendants contend that Plaintiff lacks standing to bring claims for declaratory and injunctive relief. Defendants cite *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991), for the apt proposition that "while a plaintiff who has been constitutionally injured can bring a § 1983 action to recover damages, that same plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future." Plaintiff

neither cites any binding authority nor makes any compelling argument to the contrary.

Therefore, the Court will dismiss the claims for declaratory and injunctive relief.

**IV.     CONCLUSION**

The motions to dismiss (ECF Nos. 36, 40) are GRANTED.  The Clerk is directed to CLOSE the case.

DATED this 30th day of July, 2019.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge